UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

HILLEL TAL,

          *Plaintiff,*

– against –

COMPUTECH INTERNATIONAL, INC.,

          *Defendant.*

**MEMORANDUM & ORDER**
21-cv-05773 (NCM) (SIL)

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Hillel Tal brings this diversity action alleging breach of contract by defendant Computech International, Inc. ("Computech" or "CTI"). Jurisdiction is proper under 28 U.S.C. § 1332. The Court previously granted defendant's motion to dismiss plaintiff's New York Labor Law ("NYLL"), unjust enrichment, and declaratory judgment claims. Mot. to Dismiss Order, ECF No. 40. Defendant now moves for summary judgment on plaintiff's remaining breach of contract claim. Mot. for Summ. J., ECF No. 55.[1] For the reasons stated below, defendant's Motion is **GRANTED**.

## BACKGROUND

    A.    *Overview of Plaintiff's Employment*

CTI is a small business, founded in 1994, of which Eyal Shachi is co-owner and CEO. Pl.'s Local Civ. R. 56.1 Counter-Statement of Undisputed Material Facts ¶ 3, ECF

---

[1] The Court hereinafter refers to the Memorandum of Law in Support of defendant's Motion for Summary Judgment, ECF No. 56, as the "Motion"; plaintiff's Memorandum of Law in Opposition, ECF No. 57, as the "Opposition"; and the Reply Memorandum of Law in Support of defendant's Motion for Summary Judgment, ECF No. 58, as the "Reply."

1

No. 57-1 ("56.1 Statement").[2] CTI provides technology solutions and produces computer "components and systems, imaging and printing products, storage components and systems, and surveillance and security video products with commercial and military application." 56.1 Statement ¶ 4. It also manufactures, assembles, and delivers "mechanical solutions" based on client-supplied product drawings (the "build to print" service). 56.1 Statement ¶ 4.

Plaintiff was employed at CTI from 2009 through his voluntary resignation in May 2021. 56.1 Statement ¶¶ 5, 31. CTI initially hired plaintiff as a Director of Business Development and subsequently promoted him to Vice President of Business Development on or about April 11, 2014. 56.1 Statement ¶¶ 5, 11. In both roles, plaintiff was responsible for managing projects generated by "customer orders." 56.1 Statement ¶¶ 6, 9; Oral Arg. Tr. 26:12–27:7 (draft on file with court). His duties included soliciting clients to purchase CTI's products and services (in particular, the build to print service); overseeing production, fulfillment, and delivery of customer orders; and managing client relationships. 56.1 Statement ¶ 6. Plaintiff sourced orders, located components and products, negotiated with vendors, serviced manufacturing suppliers, coordinated product build-outs, and coordinated shipping schedules, all to deliver CTI services and products as contemplated in customer orders. 56.1 Statement ¶ 6.

For his work, plaintiff was compensated through both an annual base salary and commissions. 56.1 Statement ¶ 7. The parties dispute at what point plaintiff earned his commissions: plaintiff contends that his commission was earned "solely for bringing in new business," Decl. of Hillel Tal ¶ 8, ECF No. 57-2 ("Tal Decl."), while defendant

---

[2] The following material facts, drawn from the parties' Local Civil Rule 56.1 Statements and evidentiary submissions, are undisputed unless otherwise noted.

contends that plaintiff earned commissions as a percentage of the "net profit realized by CTI" on plaintiff's projects for the preceding calendar year, *see* Decl. of Eyal Shachi ¶¶ 6–8, ECF No. 56-5 ("Shachi Decl.").

### B. The April 2014 Negotiations

On April 11, 2014, plaintiff and Shachi met in person to discuss, among other things, plaintiff's compensation. 56.1 Statement ¶ 11; Ex. C 1, ECF No. 56-6 ("Apr. 2014 Email").[3] The following day, plaintiff sent Shachi an email containing two documents: a "Summary of Discussion," which memorialized a series of "understandings" plaintiff believed the parties had reached, and a document titled "Agreement of Understanding 4/12" meant to outline a "compensation mechanism" the parties had discussed the previous day. 56.1 Statement ¶ 12; Apr. 2014 Email 1–3. Shachi neither signed the agreement nor responded to the email. 56.1 Statement ¶¶ 12, 13. Regardless, plaintiff maintains that the April 2014 Email reflects an enforceable oral agreement made between the parties. *See, e.g.*, Opp'n 4 ("CTI bears the consequences, as the employer, of failing to obtain a written and signed agreement containing the terms as required by the New York Labor Law."); Oral Arg. Tr. 19:3–17.

The unsigned Agreement of Understanding 4/12 described a compensation structure for projects and orders generated by plaintiff from customers that he "brought to the table." Apr. 2014 Email 3. It also "added" how plaintiff would be paid for certain commissions in the event of employment termination. 56.1 Statement ¶ 12. Specifically, plaintiff claimed to be entitled to post-termination commissions for compensation CTI

---

[3]     Where necessary, page numbers for the Motion, Opposition, and Reply refer to the page numbers assigned in ECF filing headers.

3

earned from all of his customers'[4] projects, so long as those projects had a "valid [purchase order] or a Letter of Intent" within 45 calendar days from his final day of employment. Apr. 2014 Email 3.[5]

### C. Subsequent Failed Negotiations

Though Shachi had not responded to the April 2014 Email, plaintiff continued to serve as Vice President of Business Development with the understanding that the terms discussed in the parties' April 2014 negotiations were in effect. Tal Decl. ¶¶ 9, 10. CTI continued to pay plaintiff annual commissions. 56.1 Statement ¶ 7. Approximately four years later, in 2018, the parties discussed a new "Sales Commission Agreement." 56.1 Statement ¶ 15. They did not come to an agreement at this time and continued operating under their "existing arrangement" (although the parties dispute the terms of that arrangement). 56.1 Statement ¶ 20.

In 2020, plaintiff again approached Shachi about his "desire to have a formal commission agreement that would, among other things, provide for post-termination commissions." 56.1 Statement ¶ 21. In an email to Shachi dated June 9, 2020, plaintiff forwarded his summaries of the parties' April 2014 discussions and attached a new agreement that he believed "capture[d] our understandings." Ex. E 1–2, ECF No. 56-8 ("June 2020 Email"). This "Sales Compensation Agreement" stipulated that, if plaintiff

---

[4] Plaintiff also details customers belonging to him, including "Beth El Industries and its subsidiaries," and "IAI/ELTA and its subsidiaries." Apr. 2014 Email 3.

[5] The "Agreement of Understanding 4/12" states these terms in less clear language. Plaintiff summarizes the parties' understanding as follows: "In case my employment at CTI is terminated/ending by either side: All projects from customers that belong to me and have a valid [purchase order] or a Letter of Intent or if a [purchase order] is received within 45 calendric days from my last day of employment at CTI –will entitle me for the agreed complete project's compensation above since the project was already secured and granted to CTI." Apr. 2014 Email 3.

4

resigned or was terminated, he would be owed "compensations from Profits earned by CTI from [plaintiff's] Customers, Build to Print, and any other projects included" in two attached exhibits. June 2020 Email 7. The draft agreement was not executed. Tal Decl. ¶ 8.

For weeks, the parties exchanged drafts of a potential agreement addressing post-termination commissions. 56.1 Statement ¶ 24. Shachi viewed post-employment restrictive covenants as a condition precedent to any such agreement. 56.1 Statement ¶ 24. At the end of these discussions, plaintiff wrote Shachi stating that, because the parties could not meet on new terms, they would "continue with our old understandings." 56.1 Statement ¶ 30; Tal Decl. ¶ 8. At issue in this case is what those "old understandings" were and if they constitute an enforceable contract.

D. *Plaintiff's Resignation*

Plaintiff tendered his resignation from CTI on May 3, 2021, "effective May 14, 2021." 56.1 Statement ¶ 31. On May 26, 2021, plaintiff formed a new company, "Integrative Tech Solutions," and identified himself as CEO. 56.1 Statement ¶ 32. Plaintiff also assumed the role of CEO of Beth-El America, LLC shortly thereafter. 56.1 Statement ¶ 32. In August 2021, CTI paid plaintiff $49,474.52 for "all commissions earned by Plaintiff through his final day of employment based upon projects completed and monies received by CTI." 56.1 Statement ¶ 33.

On October 7, 2021, plaintiff commenced this action in Nassau County Supreme Court. *See generally* State Compl., ECF No. 1-1. CTI removed the case to federal court based on diversity jurisdiction. *See* Notice of Removal ¶¶ 2–6, ECF No. 1. After the Court dismissed plaintiff's first complaint, plaintiff filed his amended complaint. *See* Am. Compl., ECF No. 56-3.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).[6] A fact is material "if it might affect the outcome of the suit under the governing law." *Id.*

The movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law. *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* The mere existence of a "scintilla of evidence" in support of the non-movant's position is "insufficient; there must be evidence on which the jury could reasonably find for" that party. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

In deciding whether or not to grant a motion for summary judgment, the district court "must resolve all ambiguities and draw all reasonable inferences *against* the moving party." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (emphasis added). The

---

[6]   Throughout this Opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

role of the district court is not to weigh the evidence and determine the truth of the matter, but rather to answer the "threshold inquiry" of "whether there is the need for a trial." *Green v. Town of East Haven*, 952 F.3d 394, 405–06 (2d Cir. 2020). In a diversity case, federal courts apply the substantive law of the forum state. *Burt Rigid Box, Inc. v. Traveler's Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

## DISCUSSION

The parties' main dispute is over whether an agreement was formed in April 2014 to support plaintiff's expectation of post-termination benefits. Because the Court finds that the undisputed facts entitle defendant to summary judgment as a matter of law even if an oral agreement existed, it proceeds under the assumption that such an agreement did exist. For purposes of this opinion, the Court refers to the putative April 2014 agreement as the "2014 Agreement" without making any determination as to the existence of that agreement. The undisputed record establishes that, because it was incapable of full performance within one year, the 2014 Agreement falls within the Statute of Frauds and is therefore unenforceable. Not only do plaintiff's own communications and documentation demonstrate that the 2014 Agreement was for an indefinite duration, undisputed facts confirm that CTI could not have terminated its alleged obligation to pay post-termination commissions within a year.

I. The 2014 Agreement

Plaintiff has repeatedly acknowledged that the 2014 Agreement was an oral agreement. Plaintiff maintains that CTI was obligated under state law to reduce the terms

7

of the parties' agreement to writing[7] but concedes the parties' shared failure to "obtain a written and signed agreement." Opp'n 4; *see also* Oral Arg. Tr. 19:7–17 (confirming plaintiff's position that the 2014 Agreement was a "verbal agreement"). Indeed, plaintiff testified that the "Summary of Discussion" and the "Agreement of Understanding" accompanying the April 2014 Email were meant to "summarize[] the major points" of his meeting with Shachi. Tal Decl. ¶ 6. As plaintiff notes, Shachi "refused repeatedly to put [the 2014 Agreement] into writing." Tal. Decl. ¶ 7.

As discussed below, the 2014 Agreement falls within New York's Statute of Frauds and therefore entitles defendant to summary judgment. The Statute of Frauds bars an oral agreement for post-termination commissions that is based on the will of a third party and indefinite in duration. Because no record evidence suggests that the 2014 Agreement would have been performable within a year, no reasonable jury could find that it was enforceable as a matter of law.

Before reaching the substance of the applicability of the Statute of Frauds, the Court acknowledges that plaintiff did not address its application in his Opposition. Nonetheless, the Court may consider an argument raised for the first time in summary-judgment reply papers. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005). This is especially true when plaintiff cannot claim that he "was blindsided by Defendant['s] reliance" on a particular issue "or that [he] was prejudiced by the district court's consideration of that issue." *Id.*; *see also id.* at 252 n.4. Here, plaintiff

---

[7] Plaintiff's reference to NYLL Section 191[(1)(c)], *see* Opp'n 9, is improper. At the motion to dismiss stage, the Court dismissed plaintiff's NYLL Section 191(1)(c) claim on the basis that he could not "qualify as a commission salesperson under the statute." Mot. to Dismiss R. & R. 11, ECF No. 38, *adopted*, Mot. to Dismiss Order. As such, he is not "covered under NYLL § 191(1)(c)" for purposes of this action. *Id.*

8

demonstrated awareness of potential arguments concerning the applicability of the Statute of Frauds in his brief in opposition to defendant's motion to dismiss. Pl.'s Second Mot. to Dismiss Opp'n 13–14, ECF No. 33. More importantly, after oral argument, the Court provided plaintiff the opportunity to file supplemental briefing on the applicability of the Statute of Frauds, which he did. *See* Min. Entry dated Nov. 5, 2024; Pl.'s Suppl., ECF No. 59.

II.     The Statue of Frauds

The New York Statute of Frauds voids a verbal agreement that "[b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime[.]" N.Y. Gen. Oblig. Law § 5-701(a)(1). The law exists to "prevent fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury." *Nasso v. Bio Reference Laboratories, Inc.*, 892 F. Supp. 2d 439, 446–47 (E.D.N.Y. 2012). "Because memories fail over time," the Statute of Frauds requires an agreement "that is not to be performed within one year of its making" to be reflected in a written contract. *Sheehy v. Clifford Chance Rogers & Wells LLP*, 3 N.Y.3d 554, 560 (2004).

At-will employment contracts are generally considered *outside* the scope of the Statute of Frauds, as such contracts can generally be completed within a year if either party exercises its termination option. *See Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007). However, a service contract that is not time limited (of "indefinite duration") and in which "one party agrees to procure customers or accounts or orders on behalf of" another is not by its terms performable within a year and thus must be in writing. *Nasso*, 892 F. Supp. 2d at 447 (quoting *Zupan v. Blumberg*, 2 N.Y.2d 547, 550 (1957)). When "the accrual of commission is dependent upon the will of a third party,"

9

such as a customer, "and not upon the parties to the contract, the oral commission agreement is, by its terms, incapable of completion within one year." *Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV*, 754 F. Supp. 2d 610, 613 (S.D.N.Y. 2010). Thus, when a contract ties a party's obligation to pay commission to an occurrence that is "outside [that party's] control and may not occur for an indefinite time in the future," it must comply with the Statute of Frauds. *Williams v. Preeminent Protective Servs., Inc.*, No. 14-cv-05333, 2017 WL 1592556, at *5 (E.D.N.Y. Apr. 28, 2017); *see also Bonsey v. Kates*, No. 13-cv-02708, 2013 WL 4494678, at *7 (S.D.N.Y. Aug. 21, 2013) (holding that sale of a cello fell inside the Statute of Frauds because "though the sale of [the] cello could have been completed within one year, performance was dependent, not upon the will of the parties to the contract, but on that of a third party buyer"). This rule protects potential defendants from being "burdened with a contractual liability of potentially infinite duration." *Levine v. Zadro Prods., Inc.*, No. 02-cv-02838, 2003 WL 21344550, at *4 (S.D.N.Y. June 9, 2003).

Where, as here, a plaintiff "brings a breach of contract action for alleged unpaid post-termination commissions based on an oral contract," New York courts have "consistently found that the Statute of Frauds applies." *Bentivegna v. People's United Bank*, No. 14-cv-00599, 2017 WL 3394601, at *26 (E.D.N.Y. Aug. 7, 2017) (collecting cases); *see also Levine*, 2003 WL 21344550, at *5 ("Even if these clients do not place orders in a given year, they may do so in the future and plaintiffs would continue to be entitled to commissions on those later orders. . . . Accordingly, New York courts have consistently found the Statute of Frauds to apply where such commission agreements are involved.").

10

The record evidence—indeed, plaintiff's own description—of the 2014 Agreement establishes that it subjected defendant to liability for an indefinite duration dependent on the will of CTI customers.

CTI initiated projects, some of which plaintiff oversaw, by securing purchase orders from customers. 56.1 Statement ¶ 6; Oral Arg. Tr. 27:2–7. Plaintiff does not dispute that CTI projects typically ranged in lifespan from two to six years. Shachi Decl. ¶ 4; *see also* Oral Arg. Tr. 27:17–22. Throughout the lifecycle of a project, customers might place multiple purchase orders. *See* Apr. 2014 Email 2 (contemplating the existence of "derivative and complimentary orders . . . such as service and warranty orders"); *see also* Oral Arg. Tr. 26:22–27:7. The possibility of such purchase orders would therefore entitle plaintiff to commission for an indeterminable period in the future.

Plaintiff himself describes demand for complete project compensation as encompassing indeterminate future orders: "All projects from customers that," as of April 2014, "belong to [plaintiff] and have a valid [purchase order] or a Letter of Intent" prior to or within 45 days of his "last day of employment at CTI" would entitle plaintiff to compensation. Apr. 2014 Email 3. In essence, the 2014 Agreement would provide plaintiff commissions from certain projects, so long as those projects result in compensation to CTI. However, such an agreement makes CTI contractually liable to plaintiff based on the indefinite intentions of a third party.

Because CTI's projects varied in duration and contained the possibility of multiple customer purchase orders, defendant's liability was "dependent . . . upon the will of a third party" and of indefinite duration. *See Komlossy v. Faruqi & Faruqi LLP*, No. 15-cv-09316, 2017 WL 722033, at *6 (S.D.N.Y. Feb. 23, 2017). These are the precise agreements courts have found to be incapable of performance within a year. *See Bentivegna*, 2017 WL

3394601, at *26. Even if plaintiff's customers did not "place orders in a given year, they may do so in the future" under the same project, entitling him to "commissions on those later orders." *Id.* (quoting *Levine*, 2003 WL 21344550, at *5). In some cases, the 2014 Agreement would hold defendant liable for payment based on customers' mere "Letter[s] of Intent" if they result in actual orders at some point in the future.[8] Apr. 2014 Email 3; Oral Arg. Tr. 22:6–23:10 (clarifying that plaintiff seeks no commission where CTI does not profit as expected). Indeed, plaintiff agreed at oral argument that if a customer secured by plaintiff did not submit their purchase order until two years after plaintiff's resignation, he would still expect to be entitled to the commission pursuant to the 2014 Agreement. Oral Arg. Tr. 23:2–10.

Furthermore, the record would not allow any reasonable trier of fact to find that any single project for which plaintiff was entitled to commissions could be completed within a year. For one, and as mentioned, it is undisputed that the typical lifespan of a CTI project was between two to six years. Oral Arg. Tr. 27:17–22. Moreover, the 2014 Agreement would hold defendant liable to compensate plaintiff "for each delivery/milestone until the full completion of the *project* or 5 years *whichever comes last*." Apr. 2014 Email 3 (emphases added). This condition, when applicable, suggests that plaintiff expected to earn project compensation for at least five years after his termination.

---

[8] Plaintiff's contention at oral argument that he is due post-termination commissions because "he did what he needed to do" to be entitled to the complete project's compensation does not end the analysis. Oral Arg. Tr. 20:2–12. New York courts have consistently held that to avoid the Statute of Frauds, an oral agreement must by its terms be capable of full performance by *both* parties within one year. *See Smith v. Marvella, Inc.*, No. 93-cv-00827, 1994 WL 30452, at *1 (S.D.N.Y. Jan. 31, 1994). The Court of Appeals has concluded that the relevant Statute of Frauds "provision relates to the performance of the *contract* and not just of one party thereto." *Guilbert*, 480 F.3d at 151 (citing *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 368 (1998)).

Viewed in the light most favorable to plaintiff, the evidence establishes that the 2014 Agreement was by its terms incapable of performance within one year.

Plaintiff's attempts to bring the 2014 Agreement outside the reach of the Statute of Frauds fail as a matter of law. *See generally* Pl.'s Suppl. In his supplemental brief addressing the Statute of Frauds, plaintiff insists that he does not claim "entitlement to a stream of commission from orders that might or might not be placed at the whim of his former customers," but only for "specific sales that he had already made prior to his last day of employment." Pl.'s Suppl. 1–2. Similarly, plaintiff's Opposition emphasizes that his demand is for "specific sales orders he secured during his CTI employment which were to be fulfilled thereafter during specific time periods." Opp'n 8. If the terms of the 2014 Agreement tracked this description, a trier of fact could find that post-termination commissions would be completely paid within one year, thus not subjecting it to the Statute of Frauds. But that is not the case here.

The present question is the enforceability of the parties' 2014 Agreement, not the narrower relief plaintiff seeks. More specifically, at the summary judgment stage, the Court must consider whether plaintiff proffered more than a "scintilla of evidence" that the 2014 Agreement was enforceable—he has not. As detailed above, there is no record evidence that the 2014 Agreement is limited to specific sales plaintiff made prior to his last day of employment, which would make the agreement fully performable within one year. It is for this exact reason that the court in *Intertex*, the only case plaintiff offers to support his position, is inapposite. There, the Court found that an alleged commission agreement did not fall within the Statute of Frauds because its terms stipulated that plaintiff's "right to commissions would cease" upon termination. *Intertex*, 754 F. Supp. 2d at 614. Here, plaintiff offers no evidence that a similar term existed in the 2014

13

Agreement and fails to address evidence suggesting that, at formation, commissions were expected for years to follow.

The inconsistent interpretations of the parties' April 2014 negotiations—some arising throughout plaintiff's own submissions—reflect the Statute of Fraud's purpose. The Statute of Frauds protects parties from fraud relating to "certain legal transactions particularly susceptible to deception, mistake and perjury." *Sheehy*, 3 N.Y.3d at 560. A writing manifesting any agreement between the parties would have eliminated ambiguities that the parties dispute over ten years later. For example, in the April 2014 Email, plaintiff characterized the "compensation mechanism" as he understood it to entitle him to commissions for a "complete project's compensation," without reference to a project's indefinite lifespan. Apr. 2014 Email 1, 3. However, plaintiff now claims entitlement to "commissions owed on orders that were payable as of the date of his resignation." Am. Compl. ¶ 19.[9] Because plaintiff's breach of contract claim is premised on an unenforceable verbal agreement, it must be dismissed.

---

[9]     In his written declaration, plaintiff claims for the first time that he is owed $4,600 in commission payments "on sales contracts fulfilled before [his] CTI employment ended." Tal Decl. ¶ 11; *see also* Oral Arg. Tr. 32:23–33:11. For one, the Court "should not on summary judgment consider factual allegations and legal theories not raised in the complaint." *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 413 (S.D.N.Y. 2012). Additionally, "[c]onclusory statements, devoid of specifics, are insufficient to defeat a properly supported motion for summary judgment." *Transflo Terminal Servs., Inc. v. Brooklyn Res. Recovery, Inc.*, 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017). Plaintiff points the Court to no evidence or other submissions explaining how he arrived at this calculation. Because no rational factfinder could conclude that plaintiff's unsupported claim entitles him to relief, it must be dismissed.

14

## CONCLUSION

For the reasons stated above, the Court **GRANTS** defendant's motion for summary judgment in its entirety. The Clerk of Court shall enter judgment accordingly and close the case.

**SO ORDERED.**

                                                                _/s/Natasha C. Merle_
                                                                 NATASHA C. MERLE
                                                                 United States District Judge

Dated:        November 20, 2024
                 Brooklyn, New York